COTELINI v. KEARNS et al.

No. 5063.   Decided May 9, 1932.   (11 P. [2d] 317.)

*E. M. Morrissey*, of Salt Lake City, for appellant.

*Leslie Frazer*, of Salt Lake City, for respondent.

FOLLAND, J.

This is an action to recover damages for personal injuries alleged to have been suffered by plaintiff while in the employ of defendant. From a judgment in favor of plaintiff, the defendant Kearns appeals. Thomas O. May, although named as a party defendant, was never served with summons, and the case proceeded against the defendant Thomas F. Kearns alone. The allegations of the complaint are that plaintiff, when 16 years of age, was employed by defendant under a written contract for a period of three years as an apprentice for the purpose of learning the trade of stable boy and rider of race horses; that on September 27, 1927, approximately one month after the making of such contract, the defendant, having full knowledge of the habits and character of the race horse Princess Hermes, owned by defendant, "said horse being a fractious and uncontrollable animal and having on several occasions prior to said 27th day of September, 1927, broken down the barriers of race tracks, and beyond the control of its rider, and with full knowledge of the inexperience of the said plaintiff in connection with the riding and control of race horses, and without first informing the said plaintiff that said Princess Hermes was a fractious and uncontrollable animal, instructed and directed the said plaintiff to ride said horse at a high rate of speed as near as possible to the inside railing of the race track at the State Fair grounds" in Salt Lake City; that plaintiff in accordance with such instructions, and as an employee of the defendant, "did ride said Princess Hermes and during the course of said race the said horse in a fractious mood left the race track, broke down the railing and beyond the control of the plaintiff, falling to the ground and rolling over three times" injuring the plaintiff. A general demurrer was filed to the complaint. The defendant by answer denied the allegations of the complaint, except that plaintiff entered his employment as a rider of race horses and alleged that if plaintiff was injured on the occasion complained of such injuries were directly and proximately con-

tributed to and caused by plaintiff's negligence in pulling the horse, by means of the reins affixed to the bridle on the horse's head, toward, into, and upon the fence or the rail of the race track, thereby causing himself to be thrown from the horse's back to and upon the ground, and that plaintiff had full knowledge of the kind and character of the horse, Princess Hermes, and assumed the risk of all injury in riding the horse.

At the close of the evidence, defendant moved the court to direct a verdict on the grounds that plaintiff failed to establish the acts of negligence alleged in the complaint, or that the alleged acts of negligence were the proximate cause of the injury; and that it affirmatively appeared that plaintiff's injury was the result of and was caused by a risk or hazard that plaintiff assumed; that such risk was an ordinary risk or danger incident to the work, open and obvious, and known to the plaintiff. The overruling of the motion for a directed verdict is assigned as error. From a careful review of the evidence, we are of the opinion that the motion should have been granted.

The following are facts shown by the evidence: In the summer and fall of 1929, the defendant Thomas F. Kearns was the owner of from four to eight race horses which were being trained for racing at his ranch near Park City and at the race tracks at Lagoon and the state fair grounds. The person in charge of the horses as trainer was Thomas O. May who also had charge of the stable boys, the boys exercising the horses, and the jockeys. The plaintiff had no direct contract with the defendant Thomas F. Kearns but received all his instructions from Mr. May. On August 20, 1927, a written contract of employment was entered into between defendant and plaintiff, then 16 years of age, whereby the plaintiff was apprenticed to the defendant for a term of three years to be taught the "trade or draft of stable boy and rider of horses." Plaintiff had been employed by defendant for two months or more prior to the making of the written contract. In June

of the same year, plaintiff spent about a month at the Kearns ranch near Park City where he was given his first lessons in horsemanship. Here he rode polo ponies and galloped many times one of the thoroughbred race horses, a two-year old colt called Lahania, on an improvised track around the pasture at the ranch. While exercising the race horse he was accompanied by Mr. May riding a pony alongside the horse. Early in July the Kearns horses were taken to the Lagoon race track for the summer race meet. The horses remained there about sixty days, during which time plaintiff was exercising and galloping race horses and rode as jockey in at least two races. He there became acquainted with the mare Princess Hermes and exercised her on numerous occasions (his own testimony was ten or twelve times) with Mr. May on a saddle horse riding alongside and holding the race horse by means of a halter strap. He, as a jockey, rode her in at least one workout race against another horse. While at Lagoon he also exercised and galloped horses for other owners, being permitted so to do by Mr. May in order to make a little more money for himself. About a week before the accident, the Kearns horses were taken to the fair grounds for the October race meet. Plaintiff came with them and continued his work as stable boy and exercising horses on the state fair grounds race track. The night before the accident Mr. May said to plaintiff he was to "work" Princess Hermes the next morning, assuring him that she was safe and gentle, and admonished him that, if he expected to make good as a jockey, he must have confidence in himself and must not be "yellow." There is no evidence in the record that Princess Hermes was a fractious or uncontrollable horse, as alleged in the complaint. She was shown to be a mare of fine disposition but rather sluggish, so that she had to be hit with a whip to get her started from the post; that she had not been known to break barriers or run away; that she had an inclination to throw her head and to "bear out" in a race and had a special bit made for her with a ring under the jaw to aid in keeping her from

"bearing out" because "a horse that bears out loses so much ground." Plaintiff had exercised this horse many times, and knew as much about its character and habits as any one, so far as the evidence discloses her habits or disposition. One witness said he had seen plaintiff "working" a crazy horse at the fair grounds track, but it is not at all certain from his testimony that the horse he called "crazy" was Princess Hermes, although that inference probably arises from the testimony. The witness gave no explanation of what he meant by the word "crazy." If his description had reference to Princess Hermes, it naturally follows that plaintiff, who was riding the mare, must have known of such characteristics or conduct. The negligence charged is that Princess Hermes was a fractious and uncontrollable animal and was so known to the defendant, and that defendant without informing plaintiff, who was inexperienced, of such fact directed him to ride the mare at a high rate of speed as near as possible to the inside rail of the race track; and that the injuries were caused by the mare in a fractious mood breaking the railing and leaving the race track and rolling over, thereby causing the injury. As indicated, the evidence that this horse was fractious and uncontrollable is entirely lacking in the record. The evidence is without dispute that such characteristics as the horse had of "bearing out" or swinging its head were well known to plaintiff prior to the day he met with his accident. Where the plaintiff bases a right to recover on specific charges of negligence set out in the complaint, such charges as made must be proved. *Humphrey* v. *Pleasant Valley Coal Co. et al.*, 60 Utah 70, 206 P. 271; *Welch* v. *New Harper Hotel Co.*, 196 Ill. App. 94. It is elementary that plaintiff must recover, if he recover at all, on the acts of negligence pleaded. *Martindale* v. *O. S. L. R. Co.*, 48 Utah 464, 160 P. 275.

It is evident that the accident was caused by the horse being driven too close to the inside rail, so close indeed that the horse scraped her side against the rail, thereby cutting

the hair from her side and cutting the girth of the saddle, causing the plaintiff to be thrown over the rail to the ground. The accident was witnessed by three persons other than the plaintiff; but only one, the witness Bivens, was close enough to describe it in detail. The plaintiff in describing how the accident happened said:

"A. I took and I got the mare going and when I got in front of the judge's stand I kicked her in the belly, clucked her to go on, and she kept swinging her head sideways, going up and down like she didn't know which way to go or what. He told me to bring her as near to that inside rail as I could, and let her break away and run. He said when I got her close to the rail to keep her there so when she was entered in a race she would not go outside the track and lose ground and lose the race, so I hustled the mare up as fast as I could make her go, hollered at her and nicked around at her and tried to make her go faster. Then I took a Nelson on her.

"Q. What do you mean by that? A. It is a hold you take where the reins are tight so you can handle the head. I got her close to the rail, about two inches from the rail, so I kept sitting still on her and clucking to her to give her confidence to go on and run a little faster because the faster she ran I figured Mr. May would see that I was a boy that had nerve enough to ride a horse if he put me to riding races. I tried to give the mare confidence and rush her along. All of a sudden she swung her head back and forth and hit the fence. I don't know what happened.

"Q. All you remember is she hit the fence? A. I don't remember if she hit the fence. All remember is her swinging head. I said: 'Stop this, you dirty little son of a brick.'"

The witness Devine, who was on the southwest corner of the race track while the accident happened at the northeast corner a quarter of a mile away, said: "I just saw the mare go into a breeze and all I noticed was the mare was running awful close to the rail, when she hit the northeast corner she went right through the rail and the horse rolled on top of Joe." He could not say whether he left the saddle or the saddle went with him. He was asked if he observed the actions of the horse before she fell other than that she went through the rail, and he answered, "No, because she was breezing when I saw the mare."

"Q. What do you mean by breezing?  A. He was not breaking with the horse—she was running fast, running."

Mr. May who was watching the horse as she ran around the track testified:

"I was watching the mare work.  I was not timing her with the watch, but I saw she was working very nicely.  The boy had a good hold of her.  She was working as fine as a horse could work.  All at once—I could not apparently see why—I was here—but I saw the mare go down.  I hollered and said, 'Princess Hermes has fell.'  So, before I could get over there there were other people had got through and found Joe."

And again:

"Well, I saw the mare go down and kind of slide or skid, then she went out beyond my vision.  I could not see from where I was.  There was a kind of a depression.  The mare hit the rail and slid on the rail for quite a long ways before she went off the rail, just slid. It took all the hide off her side, and cut her leg where she had slid, and the saddle was cut.  The girth was cut completely in two by the rail."

The witness Bivins was an employee at the state fair grounds, and was working on the track.  The mare had passed him just a moment before the accident.  He described the accident as follows:

"I was going over to fix where there was a hole in the fence.  I got that far and saw the horse working.  We stopped to let the horse go by. The horse just passed me going on the straight-a-way track, when the saddle and the boy left the horse, throwing him into the center field I should judge from ten to twelve feet from the rail.  The horse made three or four jumps, probably twenty-five to thirty-five feet, and tripped over the rail herself, got up, turned completely over, got up facing the boy.  At that time I was at the boy, me and three or four of the men.  I put up my hands and the horse turned and went straight toward the Baby Shoe stables back to the barn.

"Q. How was the horse conducting herself when she was on the inside of the track?  A. Well, I considered she was running under perfect control, going right where she was held.  She was running awful close to the rail.  That is one reason I observed and made the remark that she was running awful close to the rail for a horse that is in a workout."

From this evidence it seems reasonably clear that the proximate cause of the accident was not the fractious or uncontrollable disposition or conduct of the mare. When plaintiff undertook to ride Princess Hermes on the morning of the accident, he did so with full knowledge of her habits and disposition, including the tendency to "bear out" and to throw her head, and appreciated the danger and risk incident to riding her. In his testimony he said several times that it took considerable "nerve" or "guts" to ride her.

The general rule which is applicable here is stated in 3 La Batt's Master and Servant (2d Ed.) § 1203, as follows:

"The principle has frequently been laid down or recognized that a minor assumes the ordinary risks of any employment which he undertakes, in so far as those risks are or ought to have been, known to and appreciated by him, whether the source of his knowledge be his own observation and experience, or the instructions which he has received from his employer or his employer's representative. In other words, the fact that the servant was a minor does not enlarge his rights, where it is once established that he understood the danger." See, also, *Bohn Mfg. Co.* v. *Erickson* (C. C. A.) 55 F. 943.

The master is not bound to warn a minor servant of the dangers of the service of which he is already aware, and, where it is shown that he did in fact possess full knowledge, the failure to warn could not be said to be the proximate cause of the injury. *Cronin* v. *Col. Mfg. Co.*, 75 N. H. 319, 74 A. 180, 29 L. R. A. (N. S.) 111. Also see note to last-cited case in 29 L. R. A. (N. S.) 111.

It is argued by the respondent that the verdict should be sustained on authority of *Stam* v. *Ogden Packing & Provision Co.*, 53 Utah 248, 177 P. 218, 222, wherein it is said:

"We do not assert that the order to the plaintiff to work faster, standing alone, constituted negligence; but we do maintain that considering the age of the plaintiff, the character of the work, and all the attendant circumstances, the giving of the order, unaccompanied by some kind of warning to the plaintiff to be careful, made it essentially a case for the jury."

Respondent's theory seems to be that the Stam Case is applicable because the defendant instructed the plaintiff to ride the mare at a high rate of speed as near as possible to the inside rail, without warning or instructing him of the danger incident to riding the mare close to the rail. The difficulty with this contention is that there is no allegation in the complaint upon which it can stand. Such act of negligence is nowhere alleged. The only negligence alleged is that the defendant directed the plaintiff to ride without informing him that Princess Hermes was fractious and uncontrollable.

The action of the trial court in overruling the demurrer to the complaint is assigned as error on the ground that the complaint does not allege any breach of duty owed by defendant to plaintiff, and that it affirmatively appears from the complaint that the injury the plaintiff alleges he sustained was one, the risk of which, he assumed. There may be a serious question whether the complaint states a cause of action, because it is not alleged that plaintiff was ignorant or uninformed of the habits and character of Princess Hermes. 4 La Batt's Master and Servant (2d Ed.) § 1629. Since on a retrial plaintiff may see fit to amend his complaint, we think it unnecessary to pass on this point.

The judgment is reversed and the cause remanded to the district court of Salt Lake county, with directions to grant a new trial. Costs to appellant.

CHERRY, C. J., and STRAUP, ELIAS HANSEN, and EPHRAIM HANSON, JJ., concur.